# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NEW STREAM SECURED CAPITAL FUND (U.S.), L.L.C.<br><br>Debtor. | Case No.: 11-B-10690 (MFW) |
| NEW STREAM SECURED CAPITAL FUND K1 (Cayman), LTD.,<br><br>Debtor. | Case No.: 11-B- 10696 (MFW) |
| NEW STREAM SECURED CAPITAL FUND P1 (Cayman), LTD.,<br><br>Debtor. | Case No.: 11-B- 10694 (MFW) |

**OPPOSITION TO MOTION OF CERTAIN US/CAYMAN INVESTORS FOR ENTRY OF AN ORDER PURSUANT TO RULES 26, 30, 33 AND 34 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND RULES 7026, 7030, 7033 AND 7034 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE PERMITTING EXPEDITED DISCOVERY RELATED TO THE PENDING MOTION SEEKING <u>THE APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>**

New Stream Secured Capital, Inc. ("<u>NSCI</u>"), New Stream Capital, LLC, ("<u>NSC</u>"), New Stream Secured Capital, L.P. ("<u>NSSC</u>") and New Stream Insurance, LLC ("<u>NSI</u>" and together with NSCI, NSC and NSSC, "<u>New Stream</u>"), by its undersigned counsel, files this opposition to the Motion (the "<u>Motion</u>") of Movants[1] seeking an order pursuant to Rules 26, 30, 33 and 34 of

---

[1] The "Movants" identified in the Motion are: The Latta Family Trust, Christiane L. Latta Trust, Jean Y. Rose Revocable Trust, Irwin D. Yalom and Marilyn Yalom, Robert Shostak and Nancy Shostak, Consulta Collateral Fund PCC Ltd., Consulta Alternative Strategy Fund PCC Ltd., Kas Trust Bewaarder Finles Alternative Bond Fund B.V., Kas Trust Bewaarder Finles European Selector Fund B.V., Guernoy Limited, SPL Private Finance (PF2) IC Ltd, The Stillwater Market Neutral II, LP, The Stillwater Matrix
Continued on following page

the Federal Rules of Civil Procedure and Rules 7026, 7030, 7033 and 7034 of the Federal Rules of Bankruptcy Procedure permitting expedited discovery that is allegedly related to a pending motion seeking the appointment of a Chapter 11 Trustee, and respectfully represents as follows:

**I.  Preliminary Statement**

1. The Motion and related motion seeking appointment of a Chapter 11 Trustee paint a false picture based on blatant misrepresentations and falsehoods.  Fortunately, however, merely saying something several or more times over 106 pages (and in the media) does not make it true.  New Stream objects to the Motion, the filing of which is a pure litigation tactic, undertaken in bad faith, and wholly-unrelated to any legitimate purpose in these three involuntary cases - much less in the heavily negotiated and soon to be filed pre-packaged plan of reorganization for certain New Stream entities.

2. The proffered rationale for expedited discovery is to enable the Movants to prepare for a hearing on their request for the appointment of a Chapter 11 operating trustee before the entry of an order for relief.  But, the putative debtors have no business to reorganize and the appointment of an interim Chapter 11 trustee would serve no purpose.

3. Rather, the Motion is an attempt by a small group of recalcitrant creditors of the involuntary debtors to obtain a head start on their promised opposition to New Stream's pre-packaged Chapter 11 plan that has been accepted both by the vast majority of New Stream's creditors and by enough classes to satisfy the class-acceptance requirements for confirmation of

---

Continued from previous page

Fund, L.P., The Stillwater Market Neutral Fund III SPL –Stillwater Matrix PC, Stratos Non-Directional Fund, LP, ZAM Asset Finance Limited ("ZAM AF"), Toledo Fund LLC, ZCALL, LLC, Mont Blanc Fund – Select, Absolute Return Partners, LLP, and Lillian Kling Trust.

that plan. These claimants represent less than 4% of the overall value of New Stream creditors and investors.

4. The underlying motion seeking the appointment of an interim trustee is a meritless "head-fake" designed to obtain a tactical advantage just prior to commencement of New Stream's pre-packaged Chapter 11 cases. When those cases are filed, a creditor with appropriate standing will have fair opportunity to take appropriate discovery. But, for the moment, there is no need for yet another forum for the Movants to raise the same issues that for the last two years they have been arguing in a variety of judicial and non-judicial forums.[2]

5. Those allegations have no bearing on the purported need for the appointment of an interim trustee in these involuntary cases. Indeed, two of the three putative debtors are Cayman companies with a single creditor (or shareholder) – one of the Movants. They could, therefore, have caused these putative debtors to file voluntary petitions. That, however, would have deprived Movants of their desired stage.

6. Accordingly, expedited discovery is unnecessary and, in fact, would cause needless and substantial hardship to New Stream and those other creditors who have overwhelmingly supported the upcoming Chapter 11 cases.

7. Additionally, the incredibly broad discovery being sought, which would require the production ─ on an expedited basis ─ of all the business records of New Stream for the last several years, would cause a substantial hardship on New Stream and its other creditors who

---

[2] As part of this campaign, the Movants have utilized a media strategy that has induced various publications to report on the commencement (but never the dismissal) of their unsubstantiated allegations. For example, almost immediately after the filing of their Motion, their allegations were reported in several media sources. *See, e.g.*, "*Investors Seek $320M In New Stream Ch. 11*", SECURITIES LAW360 (March 8, 2011); "*New Stream Fund Investors Seek to Force Bankruptcy*", BLOOMBER.COM, http://www.bloomberg.com/news/2011-03-07/new-stream-s-cayman-fund-faces-involuntary-bankruptcy-in-investor-petition.html (accessed March 8, 2011).

have overwhelmingly supported the upcoming Chapter 11 cases. All without any relevance to the issues in these involuntary cases. *See In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, at *9 (Bankr. D.Del. February 3, 2011) ("Discovery of relevant, nonprivileged… [information] is limited if the party from whom discovery is sought establishes that it is unreasonably cumulative or duplicative or that the burden or expense of the proposed discovery outweighs its likely benefit.") (internal citation omitted).

## II. Background

### A. Introduction to the Parties

8. NSCI, NSC, NSSC and NSI are related companies that comprise an investment fund, headquartered in Ridgefield, Connecticut, that is colloquially referred to as "New Stream."

9. The Movants are a minority of the investors (or creditors) in certain holding entities that managed by NSC and certain of its affiliates, which entities provided NSSC with capital by making secured loans to, and equity investments in, NSSC. Differing perspectives on the allocation of New Stream's assets among all of the New Stream investors, including the Movants, is at the heart of New Stream's upcoming pre-packaged chapter 11 proceedings.

10. The putative debtors have made investments in, and made loans to, NSSC. In turn, the Movants made equity interests in the putative debtors. Since these putative debtors have no other business and no other assets, the appointment of an interim trustee over these entities would be an unnecessary exercise and expense.[3]

---

[3] At the moment, it does not appear that the Movants have served either the involuntary petitions or any of their motions on the parties who would be most directly affected by their proposed action: the other investors who voted to accept the Plan. By serving only New Stream, which stands in the center of a dispute amongst opposing factions of investors, the Movants are apparently taking a convenient shortcut, once again indicating that their motions are merely posturing and not substantive. Seeking to keep the other interested parties from participating in these involuntary cases also prevents the Movants from having to address the difficult issues of jurisdiction, venue and motivation for their filings.

11.     During the last several months, New Stream has successfully negotiated a pre-packaged reorganization that is embodied in New Stream's Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated January 24, 2011 (the "<u>Plan</u>").

12.     Last evening, New Stream concluded a solicitation of all of the impaired classes of creditors affected by the Plan and in the next several days intend to file voluntary Chapter 11 cases in order to confirm the Plan and implement a reorganization that is the culmination of an effort that dates back more than two years.

13.     As detailed below, the Plan has been overwhelmingly accepted by all impaired classes and is ready to be confirmed.  The Movants, however, comprise creditors who voted against the Plan and are apparently intent on preventing it from being confirmed so they can continue to assert the inter-creditor claims that the Chapter 11 cases would attempt to resolve.

14.     When the voluntary Chapter 11 petitions are filed, New Stream will request that the Court set a schedule to consider approval of the adequacy of the Disclosure Statement relating to the debtors' Plan ("<u>Disclosure Statement</u>"), confirmation of the Plan, and adequacy of the solicitation procedures utilized in connection with the prepetition solicitation of votes to accept or reject the Plan and establishing procedures for objecting to the Disclosure Statement, the Plan, and the solicitation.  In the interim, there is no need for the Court either to order unnecessary discovery or to entertain a pointless request for an interim trustee.

15.     New Stream's Plan, if confirmed, would preserve the value of New Stream's assets, monetize them in a manner that is consistent with each asset's individual character and circumstance, provide for a fair allocation of the asset value among the competing creditor constituencies, and avoid protracted inter-creditor litigation.

16.  The Plan is the product of many months of negotiation with creditor constituencies. The negotiations culminated into the Plan, which the relevant constituencies have agreed to support on the terms set forth in two separate plan support agreements. Commencing on January 24, 2011, New Stream solicited all of the impaired creditors classes or creditors, who have overwhelming voted to accept the Plan.

17.  The Plan is predicated on a sale of NSI's portfolio of life settlement contracts on the terms set forth in an asset purchase agreement that would be approved as part of the Plan confirmation. The Plan provides for both the implementation of this asset sale and the allocation of the net proceeds among New Stream's secured creditors.

18.  Although many of New Stream's creditors will recover only a portion of their claims, the vast majority have agreed to accept the Plan because the alternatives to confirmation are significantly less attractive. The following background discussion represents only a brief summary of the detailed information that was provided to the creditors during the solicitation process. This summary will, however, assist the Court in understanding that the instant Motion is merely an egregiously-biased, lengthy, misleading, and selective distraction from the issues that the Court will need to consider as part of the confirmation process.

B.  **The New Stream Chapter 11 Debtors**

1.  **The Master Fund and Three Feeder Funds**

19.  New Stream is organized on the "master-feeder" fund structure commonly utilized by investment managers to accumulate funds raised from both U.S. and foreign investors and pool them into a single master fund. In this parlance, NSSC is the "master fund" and the primary operating entity of New Stream. The working capital for the investments made by NSSC was provided primarily by feeder funds, which are described below:

20. Two of the feeder funds, one in Bermuda and the other in the Cayman Islands are vehicles for investments made by nonresident aliens and foreign entities. The other feeder fund is the vehicle through which U.S. residents have made investments.

### C. The Bermuda Fund

21. New Stream Capital Fund Limited (the "<u>Bermuda Fund</u>") is a segregated accounts company[4] formed in Bermuda. Foreign investors hold shares in the one of the Segregated Account Classes of the Bermuda Fund; in turn, each of these Segregated Account Classes made a secured loan to either NSSC or NSI.

### D. The Cayman Funds

22. The second foreign feeder is actually a series of investment corporations organized under the laws of the Cayman Islands (collectively, the "<u>Cayman Funds</u>"). Each of the Cayman Funds holds a note issued by NSSC and secured by a pledge of NSSC's investment portfolio. Thus, each of the Cayman Funds is a secured creditor of NSSC and also owns some of the common stock of NSCI. Two of the putative debtors are among the Cayman Funds.

### E. The US Fund

23. New Stream Secured Capital (U.S.), LLC (the "<u>US Fund</u>"), is the vehicle through which U.S. residents made investments. The US Fund, which is one of the putative debtors in these involuntary cases, is also a secured creditor of NSSC and the holder of some of the common stock of NSCI.

---

[4] In a segregated account company, sometimes referred to as a "cell" company, the assets and liabilities of each of the accounts established by the company are completely walled off from the company's other assets and liabilities.

### F. The Conflicting Interests of the Investors

24. The US Fund and each of the Cayman Funds share in the same collateral pledged by NSSC on a *pro rata* basis. They are both, however, subordinate to the security interests of the Bermuda Fund, which is the genesis of the conflict amongst the various investor groups.

## III. Events Precipitating these Chapter 11 Cases

### A. Changes in Financial Markets Prompt Flood of Redemptions

25. As the Movants note, the creditors in these cases are sophisticated investors. See Motion ¶ 9 at p. 4.

26. The vast majority of New Stream's investors are "Fund of Funds". This means that they themselves are pooled investment vehicles with investors of their own, they invest in other funds, and an investment with New Stream is among several investments these investors, as Fund of Funds, have made. The balance of New Stream's investors consists largely of pension funds, private bank/trust accounts and investment/wealth advisors.

27. Since 2005, NSSC and its subsidiaries have invested in a specialized portfolio that yielded positive returns for investors. These investments included commercial loans, real estate holdings and oil and gas related investments. The largest and most valuable of these investments, however, is the portfolio of life insurance settlements held by NSI.[5]

28. In late September 2008, a series of fund failures (most notably, the allegedly fraudulent "*Ponzi* Scheme" funds run by Thomas Petters and by Bernard Madoff) had an adverse effect on many of New Stream's *investors*. New Stream itself had no investments in or relation

---

[5] The term "life settlement" refers to the purchase of a life insurance policy from its owner. The purchaser, in this case NSI, makes a lump sum cash payment to the policy's owner and becomes the owner, assuming responsibility for all subsequent premium payments, and is entitled to the benefit payable upon the death of the insured. The value of any life settlement is a function of a variety of factors, including the amount of the death benefit, the age of the insured and the premiums that are necessary to maintain the policy in force until the benefit is payable.

to any Petters or Madoff funds.  But, the collapse of those funds caused the collapsing and closing of funds that were investors in New Stream.  Other events during September 2008, including the collapse of Lehman Brothers and the near failure of several other financial institutions, compounded this negative effect, resulting in a substantial number of redemption requests by New Stream's investors, totaling approximately 60% of the value of the feeder funds (40% during just the month of September 2008).

29. As a result of these redemptions, New Stream made a decision in October 2008 to take the actions necessary to put all U.S. and Cayman investors who had not yet requested redemption, or whose redemptions had not yet become effective, on an equal footing with investors submitting the most recent redemption requests with respect to any cash to be distributed by the feeder funds.  In contrast, the Bermuda Fund took no action to prevent redemption requests taking effect in the ordinary course because there were hardly any investors who had not requested redemption.

### B. Changes in the Life Settlement Market

30. On November 28, 2008, a second major event occurred.  AVS Underwriting ("AVS"), the largest rating agency for life settlements, announced that it was revising its methodology for determining life expectancy.  In simple terms, AVS extended its views on mortality and life expectancies, which reduced the implicit value of the life settlements held by NSI.

31. Over the following three months, secondary sales of life settlements progressively dried up.  Buyers and sellers were unable to translate the changes in mortalities and life expectancies into current policy values because so few sales were being transacted.  Policies that had clear value, using any reasonable estimate of life expectancy, would frequently receive no bids when brought to market.

32. By late February 2009, the combination of the uncertainty around policy values and the general market illiquidity effectively shut down the life settlement market.

33. These events negatively impacted New Stream in two ways. First, as of November 30, 2008, 42% of New Stream's assets were in life settlements or life settlement related investments (such as premium finance loans). These assets needed to be marked to reflect the rating agencies' changing views on mortality. New Stream engaged a respected, independent actuary, Milliman Inc., to revalue the life assets. This complex and time-consuming analysis was completed in late February 2009. As a result, New Stream took a markdown against the NSI insurance portfolio (the "<u>NSI Insurance Portfolio</u>") (valued at $194 million in November 2008), resulting in $71 million of unrealized losses for NSSC at December 31, 2008.

34. Second, New Stream's ability to monetize assets in the NSI Insurance Portfolio at reasonable value in the short term was impaired. Sales could only be achieved at distressed, not fair, value. New Stream needed time for the market to normalize and reasonable trading to resume. Indications from leading participants were that the market would re-emerge over time. New Stream expected this re-emergence to take between 12 to 24 months. This estimate proved to be accurate, as limited liquidity began to return to the market late in 2010. But, it continues to be a very limited market, with only a few buyers seeking to purchase distressed portfolios.

35. While caught between redemption demands from investors and the illiquidity of the life settlement portfolio, New Stream was still required to make regular cash payments to service the premiums of the individual policies in the insurance portfolio. This required expenditures approximating $5 million per month.

**C.    Development of the 2009 Restructuring Plan**

36. Faced with the incompatible demands of investor liquidity and the illiquidity of assets in the New Stream portfolio and the need for cash to pay premiums on the life settlement

portfolio, New Stream was compelled to take action. During April and May of 2009, New Stream attempted to negotiate a restructuring of their relationships with investors (hereinafter the "2009 Restructuring").

37. The purpose of the 2009 Restructuring was to enable New Stream to liquidate investments over a period of time that would maximize their value. New Stream solicited the consent of the investors in the feeder funds to this restructuring and believed that they had obtained the investors' unanimous consent. By May 7, 2009, New Stream received consents to this restructuring from 100% of the Cayman Funds' investors, 90% of US Fund investors, and 60% of Bermuda Fund investors.

38. Shortly after the 2009 Restructuring was implemented, two Bermuda Fund investors who had not consented to the 2009 Restructuring commenced litigation in the Supreme Court of Bermuda (the "Bermuda Court"). In June 2010, one of those Bermuda Fund investors obtained a judgment declaring that the terms of the 2009 Restructuring did not apply to Segregated Account Class C or Segregated Account Class I (the "Bermuda Judgment").[6] As a result of this ruling, New Stream was unable to liquidate assets and distribute available funds in the manner anticipated by the 2009 Restructuring. Shortly after the Bermuda Court made its ruling, it appointed a receiver, John McKenna ("McKenna"), to act on behalf of Segregated Account Class C and Segregated Account Class I.

39. On June 18, 2010, on the request of the manager of the Bermuda Fund, the Bermuda Court appointed Michael Morrison and Charles Thresh of KPMG Advisory Limited, as interim joint receivers for Segregated Account Classes B, E, H, K, L, N and O of the Bermuda Fund (the "Bermuda Joint Receivers" and, together with McKenna, the "Bermuda Fund

---

[6] The Bermuda Court's ruling dealt with issues of first impression under a new statute.

Receivers") and appointed McKenna as the receiver over Segregated Account Class F. Their respective appointments were made final on July 16, 2010.[7]

40. Messrs. Morrison, Thresh and McKenna also are the Joint Provisional Liquidators of the Bermuda Fund, who are winding up the Bermuda Fund.

41. On November 26, 2010, the Bermuda Court declared that the 2009 Restructuring was void under Bermuda law and therefore had no effect on the Bermuda Fund.

### D. The NSI Insurance Portfolio Sale

42. On May 3, 2010, NSI engaged Guggenheim Securities, L.L.C. ("Guggenheim"), an independent investment bank with extensive experience in the life settlement market, to help New Stream explore financing opportunities for the NSI Insurance Portfolio, in order to address the liquidity needs referred to above.

43. Guggenheim was preparing to go into the market to seek a credit facility that would maintain the NSI Insurance Portfolio when the Bermuda Judgment was issued on June 8, 2010. Guggenheim advised NSSC that it was necessary to suspend solicitation for the financing until such time as it became clear that any prospective lender would be able to obtain a first priority security interest in the NSI Insurance Portfolio.

44. Without financing, NSI was unable to pay current premiums in full and as a result it made only *de minimis* payments on premiums coming due, causing the policies in the portfolio to fall into the "grace period". If premiums were not paid during the grace period, the policies would be terminated by the insurer.

---

[7] As a consequence of these appointments, McKenna is the legal representative of the NSI Bermuda Lenders and the Bermuda Joint Receivers are the legal representatives of the NSSC Bermuda Lenders.

45. During this time New Stream was also engaged in discussions with the Bermuda Fund Receivers about the possibility of providing financing for the payment of premiums for the NSI Insurance Portfolio. Over the course of the month of June and into July numerous attempts were made at obtaining approval from NSI's secured lenders to permit Guggenheim to proceed with the offering, but no agreement could be reached.

46. On July 20, 2010, a meeting was held among New Stream, the Bermuda Fund Receivers and representatives of the investors in the Bermuda Fund, at which a decision was reached to cease efforts to obtaining financing and instead to explore an outright sale of the portfolio.

47. Thereafter, New Stream, with the encouragement and consent of the Bermuda Fund Receivers, instructed Guggenheim to solicit offers for the purchase of the NSI Insurance Portfolio and prevent the termination of the life insurance policies.

48. While Guggenheim was exploring the market, New Stream, with Guggenheim's assistance, also began discussions with some investors in the US Fund and Cayman Funds to explore their interest in making an offer to purchase the NSI Insurance Portfolio. Eventually, these discussions coalesced around MIO Partners, Inc. ("MIO") an affiliate of several investors in the US Fund and Cayman Funds.[8]

49. Meanwhile, Guggenheim continued to seek additional bids and it received expressions of interest from five interested parties. As Guggenheim engaged in discussions with these parties, it became clear that only three of the five had both serious interest and the ability to make binding offers to purchase the Insurance Portfolio. In fact, the three interested parties

---

[8] MIO is a manager of several investment and retirement funds that hold investments in either the US Fund or the Cayman Fund.

began making uncommitted offers and continued to negotiate the purchase price with Guggenheim and New Stream.

50. These efforts to sell or finance the portfolio were conducted under the looming specter of the expiring grace periods; as policies reached the end of their grace periods for payment of premiums, they would lapse and be of no value, thereby eroding the sale value of the portfolio. Given this looming deadline and lack of liquidity, New Stream and Guggenheim concluded that the only way to conduct a timely sale would be to require that all interested parties submit their final and best offers.

51. Between July 23, 2010 and July 28, 2010, Guggenheim worked with each of the parties who had expressed interest in or made offers for the portfolio, including MIO. Because there were substantial differences among the various bids, Guggenheim and New Stream developed a standard set of terms, which Guggenheim presented to each of the interested parties on July 27, 2010, together with a notice of a bid deadline of 3:00 PM ET on July 28, 2010, for bidders to introduce, refine or improve their offers. The notice made clear that New Stream would welcome offers on any terms, but that they would ideally like to see certain features in any offer, including bridge financing with a commitment to close by July 30, 2010.

52. Three parties delivered bids to Guggenheim prior to the deadline. Guggenheim and New Stream's special counsel, O'Melveny & Myers LLP, reviewed each bid and provided New Stream with an evaluation based on (a) an assessment of the assurance of closing the transaction, (b) total economics including the size of the cash component of any offer and (c) any other features proposed.

53. On July 29, 2010, the evaluation process concluded with Guggenheim recommending the acceptance of the offer made by MIO (on behalf of the purchaser, the

"Purchaser"), to purchase the entire portfolio for a cash payment of $127.5 million. After reviewing the bids and discussing them with Guggenheim and legal counsel, New Stream concluded that the MIO offer was the highest and best offer. Thereafter, NSI and MIO, on behalf of the Purchaser, entered into a binding term sheet agreement ("MIO Purchaser Term Sheet")[9] on July 29, 2010 setting forth the terms and conditions of the sale, which was then shared with the Bermuda Fund Receivers.

54. As of the date of the MIO Purchaser Term Sheet, the terms of the sale of the NSI Insurance Portfolio to the Purchase (the "Insurance Portfolio Sale") provided for:

(i) A purchase price of $127,500,000 payable in cash at closing;

(ii) No additional due diligence required[10];

(iii) Bridge financing of up to $25,000,000, the proceeds of which were to be used to pay the premiums of the NSI Insurance Portfolio;

(iv) The financing would be provided on a "purchase price neutral" basis (*i.e.*, repayment would be *forgiven* and the amount outstanding added to the purchase price provided that MIO or its nominee was the ultimate purchaser);

(v) As soon as possible after the execution of the MIO Purchaser Term Sheet, the parties would enter into definitive documentation with a closing to occur no later than September 30, 2010;

(vi) The sale was conditioned upon either (i) consent of 100% of the investors or (ii) a bankruptcy court order authorizing a sale free and clear of all claims and interests through a bankruptcy process;

(vii) If the NSI Insurance Portfolio were sold to an alternative bidder, MIO or its nominee (*i.e.*, the Purchaser) would be entitled to a break-up fee equal to 3% of the purchase price and expense reimbursement of up to $500,000; and

(viii) MIO or its nominee (*i.e.,* the Purchaser) would offer additional incentives to the US/Cayman investors in order to induce them to support the sale.

---

[9] Prior to closing, MIO intends to assign its rights under the MIO Purchaser Term Sheet to Purchaser.

[10] MIO's bid was the only bid that was not subject to additional due diligence.

55. Following the execution of the MIO Purchaser Term Sheet, the parties began negotiating and drafting definitive documentation (the "<u>Purchase Agreement</u>") for the Insurance Portfolio Sale.[11] The provisions of the Purchase Agreement are substantially the same as those set forth in the MIO Purchaser Term Sheet. There are however, certain modifications that were negotiated during the documentation of the transaction.

56. Pursuant to the MIO Purchaser Term Sheet, the parties had anticipated a closing on or prior to September 30, 2010. However, the parties were unable to satisfy the conditions to close before such date and so the Purchaser agreed to (i) extend the timeline for closing, (ii) increase the principal amount of the "price neutral" bridge financing from $25 million to $39,480,268.58, and (iii) offer post-petition financing under a "price neutral" debtor-in-possession credit facility (the "<u>DIP Facility</u>"), provided, however, that all interest, fees and expenses under the DIP Facility would not be "price neutral" and would be fully payable in cash upon termination of the DIP Facility. In return, New Stream agreed that any death benefits received by NSI on or after October 1, 2010 would be held in escrow for the benefit of the Purchaser upon the closing of the sale.

57. As a result of the acceptance of the MIO Purchaser Term Sheet, New Stream has already received the benefit of approximately $40,000,000 of financing. In addition, the Purchaser has committed to fund up to an additional $15,000,000 during the pendency of the voluntary Chapter 11 Cases. So long as the NSI Insurance Portfolio is sold to the Purchaser, this approximately $55,000,000 of financing will effectively be added to the purchase price and will

---

[11] The final, agreed upon terms of the sale to the Purchaser are set forth in the Purchase Agreement, substantially in the form annexed to the Plan.

not need to be repaid by New Stream (except for interest, fees and expenses relating to the DIP Facility, which will be repaid in cash).

58. On the other hand, a sale to any party other than the Purchaser will require New Stream to repay the $55,000,000. Hence, in order for a sale to any party other than the Purchaser to be of greater value to New Stream's estates, it would require a purchase price of more than $182,000,000, the effective purchase price to be paid by the Purchaser.[12]

### E. The Plan Support Agreements

59. New Stream anticipated that consummation of the Insurance Portfolio Sale would serve as the foundation for a reorganization that they were attempting to negotiate with the Bermuda Fund Receivers. After lengthy and contentious negotiations, on November 9, 2010, New Stream entered into an Initial Plan Support Agreement with, *inter alia*, the Bermuda Fund Receivers and a representative of the Purchaser ("Initial Plan Support Agreement"), which outlined the terms for a restructuring.

60. Over the next several months, New Stream continued to negotiate the details of the reorganization with the Bermuda Fund Receivers and the Purchaser. These negotiations centered on a closing of the Insurance Portfolio Sale and a fair distribution of the net proceeds of New Stream's assets among its creditors. In the latter part of January 2011, the parties reached a final agreement on the details of a global settlement, which are embodied in the Plan and described in detail in the Disclosure Statement.

61. The Plan, if confirmed, would settle and resolve issues related to the rights of creditors, including the relative priorities and potential claims and causes of action that each of

---

[12] The Purchaser's break-up fee is calculated only on the base purchase price of $127,500,000, not the effective actual purchase price of $182,500,000 that includes the bridge and DIP Facility financing amounts.

them may have against the other. The Plan is intended to achieve a global resolution of all such issues and for that reason the Plan contains broad provisions relating to the distribution of assets, the method of liquidation, the release of claims and the compromise of rights and claims that New Stream's creditors may have. (Contrary to the implications in the motion for the appointment of a trustee, the third-party releases are entirely consensual).

62. The Initial Plan Support Agreement contemplated a second Plan Support Agreement that would be entered into when the parties had agreed on all terms of a reorganization plan and that would annex copies of the agreed plan and disclosure statement. Consequently, on January 21, 2011, New Stream entered into the Plan Support Agreement with, *inter alia*, the Bermuda Fund Receivers and the Purchaser, which annexed copies of the Plan and Disclosure Statement (the "Plan Support Agreement").

63. The solicitation of creditors commenced on January 24, 2011 and concluded last evening. With the acceptance from a vast majority of the affected creditors, New Stream intends to file voluntary Chapter 11 cases in the next several days in order to seek confirmation of the Plan.

64. New Stream began the solicitation on January 24, 2011 when Kurtzman Carson Consultants LLC ("KCC"), acting as the solicitation agent, sent the Plan, Disclosure Statement and appropriate forms of ballots to all parties entitled to vote. The voting deadline was March 8, 2011 at 5 p.m. Pacific time.

**IV.   The Results of the Voting**

65. The solicitation period ended last evening and the results have been certified to New Stream by KCC.

66. Briefly, the following Classes are the voting Classes, which are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim | Estimated Amount[13] | Status |
|---|---|---|---|
| 1 | NSI Bermuda Lenders | $ 81,573,375 | Accepted |
| 2 | NSSC Bermuda Lenders | $369,066,322 | Accepted |
| 3 | US/Cayman Fund | $319,346,652 | Accepted |
| 4(c) | General Unsecured Claims against NSC | unknown | No votes |

67.     With the acceptance of the impaired classes of creditors, New Stream intends to file voluntary Chapter 11 cases to seek confirmation of the Plan.

**V.     The Instant Motion Should be Denied**

68.     To justify their purported need for expedited discovery, the Movants assert that the appointment of an interim trustee is urgent because New Stream will seek to confirm their Plan "immediately following the filing of voluntary Chapter 11 petitions…". Motion ¶ 34 at 14. The connection between the allegedly urgent need for an interim trustee in these involuntary cases and the issues that will be presented when New Stream seeks to confirm its Plan are nowhere explained in the Motion. Instead, the Motion makes a number of assertions about the confirmability of the Plan, an issue that is not yet before the Court.

69.     Significantly, the Movants cannot identify any prejudice they might suffer if they are denied the right to engage in the wide-ranging discovery they now seek. The fail to identify any issue that is relevant to the motion for the appointment of an interim trustee for which they need discovery. In fact, the Movants filed a 106-page motion with volumes of exhibits. Although the Movants grossly (and repeatedly) misrepresent the facts, they are well aware of New Stream's history.

---

[13]     This is an estimate of the aggregate of all Claims that it believes, as of December 31, 2010, will be allowed in each of the identified voting classes. New Stream intends to schedule these amounts after Chapter 11 cases are commenced. The face amount of filed claims may be higher, which could reduce the value of any distributions made to creditors in the voting classes if the claims were allowed in such higher amounts.

70. When the voluntary Chapter 11 Cases are commenced, the Court will have an opportunity to consider the relevant issues in a proper and developed context. The emergency manufactured by the Movants, however, should not short-circuit the development of a proper record and careful consideration of the issues, devoid of the hyperbole and inflammatory allegations that underlie the current Motion.

**WHEREFORE**, New Stream respectfully requests that this Court deny the Motion and such other and further relief as may be just and proper.

Dated: March 9, 2011  
        Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: /s/ Kurt F. Gwynne  
Kurt F. Gwynne (No. 3951)  
J. Cory Falgowski (No. 4546)  
1201 Market Street, Suite 1500  
Wilmington, DE 19801  
Telephone: (302) 778 7500  
Facsimile: (302) 778 7575  
Email: kgwynne@reedsmith.com  
       jfalgowski@reedsmith.com

Counsel for New Stream Secured Capital, Inc., New Stream Capital, LLC, New Stream Secured Capital, L.P. and New Stream Insurance, LLC